# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01460-COA

**CESAR ADRIAN CUEVAS**                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                   **APPELLEE**

DATE OF JUDGMENT:             08/26/2019
TRIAL JUDGE:                  HON. DEWEY KEY ARTHUR
COURT FROM WHICH APPEALED:    RANKIN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:      NATHAN HENRY ELMORE
                              JANE E. TUCKER
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                              BY: LAUREN GABRIELLE CANTRELL
NATURE OF THE CASE:           CIVIL - POST-CONVICTION RELIEF
DISPOSITION:                  AFFIRMED - 10/20/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1. After transporting over 250 pounds of methamphetamine on the interstate, a defendant was indicted for aggravated trafficking. He plead guilty to the lesser-included offense of trafficking and was sentenced to thirty years in prison, with twelve years suspended and eighteen years to serve, and was placed on five years of supervised probation. He was also ordered to pay a $5,000 fine and court costs.

¶2. The defendant filed a petition for post-conviction relief (PCR), arguing that his counsel was ineffective. The trial court denied and dismissed the petition, finding that it was

1

clear from the face of the petition that the defendant was not entitled to PCR. The defendant appealed. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶3.     Officer Jason Ginn of the Mississippi Highway Patrol was driving on the interstate when he encountered a Dodge pick-up truck traveling below the posted speed-limit in the left lane of traffic. As the officer followed behind the truck, he observed other drivers passing them in the middle and right lanes. Suddenly, the driver of the truck swerved over the road's "fog line," accelerated to the posted speed limit, signaled right, and crossed over to the middle lane. At that point, Officer Ginn activated his blue lights and pulled the truck over.

¶4.     As the officer exited his patrol car and proceeded to walk toward the pick-up truck, a few objects in the bed of the truck piqued his suspicion. Several white-painted pallets that appeared to be smoothed and rounded on the corners, as if they had been "mudded," were plainly visible. Because he had never seen smooth, white pallets before, the officer touched the pallets and knocked on them. He was surprised to hear a hollow sound reverberating from the pallets.

¶5.     Officer Ginn then approached the front passenger side of the vehicle and learned that Cesar Cuevas and his father were the occupants of the truck. Cuevas furnished a Georgia license, and, upon informing Officer Ginn that he had rented the truck, also provided the officer a hard copy of the rental agreement. Officer Ginn asked Cuevas to step to the back of the truck so that he could further explain why he pulled Cuevas over. When the officer

2

walked to the bed of Cuevas's truck, he touched and knocked on the pallets again. The pallets left a white residue on his fingers.

¶6. Cuevas joined Officer Ginn at the bed of the truck. After explaining to Cuevas that he had pulled him over for traveling slowly in the passing lane, the officer initiated a series of questions. Specifically, Officer Ginn questioned Cuevas about who rented the truck, where Cuevas was coming from, where he was traveling to, and the purpose of the pallets. Cuevas replied that he had rented the truck and was traveling from Texas to Georgia. He further explained that the pallets would be used to transport auctioned goods from a yard-sale in Georgia back to Mexico.

¶7. Officer Ginn then retreated back to the truck's passenger side—at which point he observed Cuevas stretching nervously—and approached Cuevas's father to ask him similar questions. Cuevas and his father's answers were consistent.

¶8. The officer ran a search of both occupants' licenses to learn that neither Cuevas nor his father had pending warrants against them or had a criminal history. However, Officer Ginn learned that Cuevas had recently crossed the border from Mexico to the United States. At that point, he also learned that Cuevas's rental agreement had expired and that the rented vehicle was only authorized for traveling purposes in the state of Texas. In light of these circumstances, the officer called for a back-up officer to report to the scene of the traffic-stop.

¶9. In the interim, Officer Ginn continued to ask Cuevas questions regarding his mission

with the pallets. Cuevas became visibly nervous as he answered each question. The officer noticed that Cuevas and his father's answers regarding the origin of the pallets were inconsistent. When confronted, Cuevas's father attempted to rectify the inconsistency by claiming that the pallets had come from two different places.

¶10. Once the back-up officer arrived at the scene, he asked Cuevas for consent to search his vehicle. Upon Cuevas's verbal consent to search his car, the back-up officer proceeded to pat Cuevas down for weapons. Meanwhile, Officer Ginn asked Cuevas's father if "there was anything in the pallets." Cuevas's father replied, "[N]o, no, no. You can check it out."

¶11. Both Officer Ginn and the back-up officer presented a consent-to-search form to Cuevas and his father, and explained its contents to them. Both Cuevas and his father signed the form. As a result, the back-up officer drilled a hole in one of the pallets. A white residue returned on the drill-bit. When the officers tested the residue, they found that the substance tested positive for methamphetamine. Cuevas was transporting over two-hundred pounds of the illegal substance. Both he and his father were subsequently arrested at the scene.

¶12. Cuevas ultimately plead guilty to the charge of trafficking. At his plea hearing, the trial court questioned him extensively about the core characteristics of his guilty plea. Specifically, the court asked Cuevas to affirm whether he had read and signed the petition to enter the plea, whether he understood its contents, and whether its contents were "true and correct." Cuevas answered these questions affirmatively. The court also asked Cuevas whether he had discussed the facts, circumstances and elements of the crime of trafficking

with his attorney. Cuevas replied that he had. The court proceeded to read Cuevas the elements of the crime for which he was charged, informed him of his rights, and explained to him the maximum and minimum sentences for the crime. Cuevas was read the factual basis of his charges and asked whether any "threats or promises" were made to him to enter a guilty plea. Cuevas agreed with the factual charges against him and confirmed that no threats or promises were made to him.

¶13. The trial court followed up with a series of additional questions. Specifically, Cuevas was asked if he decided to plead guilty, whether he was "freely" and "voluntarily" admitting his guilt, and whether he was satisfied with his attorney's representation. Cuevas answered each question in the affirmative.

¶14. The trial court later asked Cuevas's attorney if she and her client had an opportunity to review the pre-sentence report pertaining to his charges and if there were any errors in the report that the court needed to address. Cuevas's attorney replied that no corrections were necessary.

¶15. Cuevas admitted at the hearing that he made arrangements to transport the methamphetamine, confirmed the location to which he was delivering it, and gave an estimate of how much he would be paid to do so. Cuevas's attorney then offered letters on Cuevas's behalf and certification from Cuevas's schooling as mitigating factors. Cuevas apologized to the court for his actions and took responsibility for them.

¶16. As a result of his guilty plea, Cuevas was sentenced to thirty years in prison, with

twelve years suspended and eighteen years to serve, and five years of supervised probation. He was ordered to pay a fine of $5,000 and court costs.

¶17.    Cuevas filed a petition for post-conviction relief.  After considering the petition, transcripts of prior proceedings, and his criminal file, the trial court denied the petition. Specifically, the court found that it was clear on the face of his petition that Cuevas was not entitled to PCR.

¶18.    On appeal, his arguments can be summarized into three main claims: (1) the trial court erred in denying his PCR petition without a hearing, (2) his lawyer was ineffective in failing to provide evidence to substantiate the mitigating factors, and (3) his lawyer was ineffective in failing to show the pre-sentencing report to his client.

## STANDARD OF REVIEW

¶19.    "When reviewing a trial court's denial or dismissal of a PCR petition, we will only disturb the trial court's factual findings if they are clearly erroneous; however, we review the trial court's legal conclusions under a de novo standard of review." *Brown v. State*, 211 So. 3d 709, 711 (¶5) (Miss. Ct. App. 2016).

## ANALYSIS

¶20.    Cuevas claims that the trial court erred in denying his PCR petition without a hearing because the merits of the motion "require[d] further inquiry in the expanded setting of an evidentiary hearing[.]" *Myers v. State*, 583 So. 2d 174, 175 (Miss. 1991).  We find his argument unpersuasive.

¶21.    Not all PCR petitions require a "full adversarial hearing." *Johnston v. State*, 172 So. 3d 756, 790 (¶10) (Miss. Ct. App. 2012).  In fact, a PCR petition may be dismissed without the benefit of a hearing "if it plainly appears from the face of the motion, any annexed exhibits and the prior proceedings in the case that the movant is not entitled to any relief." *Id*. (quoting *Hoyt v. State*, 952 So. 2d 106, 1022 (¶21) (Miss. Ct. App. 2007)).  Accordingly, we look to the "face" of Cuevas's motion to determine whether "it plainly appears" that he "is not entitled to any relief." *Id*.

¶22.    The overall theme of Cuevas's PCR petition appears to center on an ineffective-assistance-of-counsel claim.  But because Cuevas plead guilty to his charges, our ability to analyze this claim is limited.  Under these circumstances, his PCR claim is waived unless we find that his guilty plea was involuntary.  For "[a] voluntary guilty plea waives claims of ineffective assistance of counsel, except insofar as the alleged ineffectiveness relates to the voluntariness of the giving of the guilty plea." *Worth v. State*, 223 So. 3d 844, 849 (¶17) (Miss. Ct. App. 2011).

¶23.    Cuevas argues his plea was involuntary because his attorney failed to inform him that he was the subject of what he insists was an illegal stop and search.  However, we rejected a parallel claim in *Worth*.  In that case, the petitioner claimed that his plea was involuntary because his attorney failed to adequately inform him about his sentence. *Id*. at 850 (¶19). This Court held that pleas are traditionally voluntary as long as a judge advises a defendant of his "rights, the nature of the charge against him, and the consequences of his plea." *Id*.

7

The *Worth* Court explicitly ruled that the petitioner's allegations failed "to establish a claim for post-conviction relief when . . . the circuit court's plea colloquy and voluntariness inquiry affirmatively establish that the petitioner was clearly and correctly informed of the minimum and maximum sentence and other consequences of his plea." *Id*. at 851 (¶23).

¶24. Likewise, in *Britain*, a man claimed his counsel was ineffective because the lawyer "failed to acknowledge the fact that probable cause and a search warrant were lacking." *Britain v. State*, 229 So. 3d 211, 213 (¶12) (Miss. Ct. App. 2017). The Court dismissed this argument and pointed out that the man's trial attorney "counseled and advised him on the nature of the charge, any lesser-included offenses, and all possible defenses that [the appellant] might have had in [the] case." *Id*. at 213-14 (¶12). While concluding that "[s]olemn declarations in open court carry a strong presumption of verity[,"] the Court further relied on the appellant's verbal assurance to the trial court that he was "satisfied with his counsel and the assistance she provided." *Id*. at 214 (¶12).

¶25. Pursuant to *Worth* and *Britain*, Cuevas's claim is without merit. Cuevas does not provide this Court with any plausible reason as to why his counsel was ineffective or how his plea was involuntary other than his belief that his counsel should have challenged his stop, search, and seizure and informed him that such evidence could have been potentially suppressed. Instead, as in *Worth*, the trial court adequately informed Cuevas of his "rights, the nature of the charge against him, and the consequences of his plea." *Worth*, 223 So. 3d at 849 (¶17). And as in *Britain*, Cuevas solemnly declared "in open court" that he was pleased

with his lawyer's assistance and was devoid of complaints. *Britain*, 229 So. 3d at 211 (¶12). Further, Cuevas confirmed that he and his attorney discussed the ramifications of his guilty plea and the facts, circumstances, and elements of the charge against him. We accordingly find his argument unpersuasive.

¶26. Our court's historical threshold for voluntariness of a plea is clear. A plea is voluntary if "the circuit court 'advised [a] defendant of his rights, the nature of the charge against him, as well as the consequences of [his] plea.'" *Id*. at 213 (¶9) (internal quotations omitted). The record reveals that the trial court followed the standard set out by our precedent and adequately afforded Cuevas an opportunity to raise any concerns that could have affected his freedom. Cuevas unequivocally affirmed to the court that he was fully aware of the consequences of his decision. As a result, his plea was voluntary and valid.

¶27. Because his plea was valid, we also decline to address any of Cuevas's sub-issues that nakedly challenge the events of his search and seizure. For "[a] valid guilty plea constitutes a waiver of constitutional claims, including illegal search and seizure." *Britain*, 229 So. 3d at 213 (¶8).[1]

¶28. The ineffective-assistance-of-counsel claim, which is the subject of Cuevas's PCR

---

[1] As part of his argument that his initial stop was illegal, Cuevas claims that crossing over a fog-line while driving is not a sufficient basis to initiate a traffic stop. He points to case precedent from other states to support his position. Yet our Supreme Court explicitly rejected this argument in *Martin v. State*, 240 So. 3d 1047, 1052 (¶16) (Miss. 2017). The defendant in that case crossed over the fog line and was subsequently stopped by the police. *Id*. at 1053 (¶20). The Court held that even crossing a fog line on one occasion gave rise to probable cause for the stop. *Id*. at 1054 (¶24).

petition, is without merit. Therefore, his petition did not "require[] further inquiry in the expanded setting of an evidentiary hearing." *Myers*, 583 So. 2d. at 175. Accordingly, the trial court did not err in denying Cuevas's petition without a hearing.

¶29. Cuevas raised two other claims regarding mitigation evidence and his pre-sentence report. Neither affect the voluntariness of his guilty plea, as *Worth* requires, and so they are procedurally barred.

¶30. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD AND LAWRENCE, JJ., CONCUR.**